## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| PATRICIA DAVIS, Individually and on Behalf of All Others Similarly Situated,   )<br>  )<br>  Plaintiff,   )<br>  )<br>v.   )<br>  )<br>HY-VEE INC.,   )<br>  )<br>  Defendant.   ) | Case No.: 19-cv-941<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**Jury Trial Demanded** |

### INTRODUCTION

1.      This class action seeks redress for negligence because of the failure of Hy-Vee, Inc. ("Hy-Vee") to implement and maintain reasonable security measures over consumers' personally identifiable information.  Specifically, Hy-Vee's failure to adopt reasonable security measures and protocols put millions of consumers' personal credit and debit card information at an unreasonably high risk of disclosure, a risk that materialized into actual harm as a result of a months-long data breach that affected more than five million people.

### JURISDICTION AND VENUE

2.      The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

3.      The Court has personal jurisdiction over Defendant because Plaintiff's claims arise out of Defendant's contacts with Wisconsin.

4.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims emanated from activities within this District.

## PARTIES

5.      Plaintiff Patricia Davis is a citizen of the State of Wisconsin who resides in Dane County.

6.      Defendant Hy-Vee, Inc. is an Iowa corporation with its principal place of business located at 5820 Westown Pkwy., West Des Moines, Iowa 50266.

## FACTS

7.      Hy-Vee is a chain of more than 245 supermarkets located throughout the Midwestern United States, operating stores in Iowa, Illinois, Kansas, Minnesota, Missouri, Nebraska, South Dakota, and Wisconsin.  Many Hy-Vee stores are "one-stop" or "full-service supermarkets," offering consumers the option to purchase not only foodstuffs but also, among other things, flowers, pharmacies, and alcoholic beverages including wine and spirits.

8.      Certain of Hy-Vee stores also operate vehicle fuel pumps, drive-thru coffee shops, and restaurants, such as the Hy-Vee Market Grille.

9.      On June 25, 2019, Plaintiff Patricia Davis purchased take-away "hot bar" food items from the Hy-Vee Market Grille location at 2920 Fitchrona Road, Fitchburg, Wisconsin.

10.      Plaintiff purchased the hot bar food items with her debit card, entering her debit card PIN to complete the purchase.

11.      In the course of providing its services to consumers, Hy-Vee accepts payments by debit card and credit card.

12.    On or about August 14, 2019, Hy-Vee issued a Press Release entitled *Notice of Payment Card Data Incident*, which announced that Hy-Vee had been subject to a "data incident involving its payment processing systems" (hereinafter, the "Data Breach") This press release stated, in part:

**Notice of Payment Card Data Incident**

West Des Moines, IA (Aug. 14, 2019) – See below for a statement from Hy-Vee, Inc. regarding an investigation the company is conducting into a data incident involving its payment processing systems:

Hy-Vee takes the security of payment card data very seriously. We want to make customers aware of an investigation we are conducting into a security incident involving our payment processing systems that is focused on transactions at some Hy-Vee fuel pumps, drive-thru coffee shops, and restaurants, as well as to provide information on the measures we have taken in response and steps customers may consider taking as well.

After recently detecting unauthorized activity on some of our payment processing systems, we immediately began an investigation with the help of leading cybersecurity firms. We also notified federal law enforcement and the payment card networks. We believe the actions we have taken have stopped the unauthorized activity on our payment processing systems. Our investigation is focused on card transactions at our fuel pumps, drive-thru coffee shops, and restaurants (which include our Market Grilles, Market Grille Expresses and the Wahlburgers locations that Hy-Vee owns and operates). These locations have different point-of-sale systems than those located at our grocery stores, drugstores and inside our convenience stores, which utilize point-to-point encryption technology for processing payment card transactions. This encryption technology protects card data by making it unreadable. Based on our preliminary investigation, we believe payment card transactions that were swiped or inserted on these systems, which are utilized at our front-end checkout lanes, pharmacies, customer service counters, wine & spirits locations, floral departments, clinics and all other food service areas, as well as transactions processed through Aisles Online, are not involved.

Because the investigation is in its earliest stages, we do not have any additional details to provide at this time. We will provide notification to our customers as we get further clarity about the specific timeframes and locations that may have been involved.

It is always advisable to closely monitor your payment card statements for any unauthorized activity. If you see an unauthorized charge, immediately notify the

financial institution that issued the card because cardholders are not generally responsible for unauthorized charges reported in a timely manner. The phone number to call is typically located on the back of the payment card.

For more information, please visit www.hy-vee.com/protectingourcustomers.

13.    According to this press release, the Data Breach affected Hy-Vee's customers who made card purchases at Hy-Vee's fuel pumps, drive-thru coffee shops, and restaurants, including Hy-Vee Market Grilles, Market Grille Expresses and Wahlburgers locations that Hy-Vee owns and operates but apparently did not affect customers who made card purchases through checkout lines at Hy-Vee grocery stores, drugstores, and convenience stores.

14.    The press release explains that the reason purchases at Hy-Vee's fuel pumps, drive-thru coffee shops, and restaurants were affected but purchases through checkout lines at Hy-Vee grocery stores, drugstores, and convenience stores were not affected was that the affected locations "have different point-of-sale systems."

15.    On or about August 22, 2019, krebsonsecurity.com posted an article entitled *Breach at Hy-Vee Supermarket Chain Tied to Sale of 5M+ Stolen Credit, Debit Cards*, which stated, in part:

> On Tuesday of this week, one of the more popular underground stores peddling credit and debit card data stolen from hacked merchants announced a blockbuster new sale: More than 5.3 million new accounts belonging to cardholders from 35 U.S. states. Multiple sources now tell KrebsOnSecurity that the card data came from compromised gas pumps, coffee shops and restaurants operated by Hy-Vee, an Iowa-based company that operates a chain of more than 245 supermarkets throughout the Midwestern United States.
>
> [***]
>
> But typically, such breaches occur when cybercriminals manage to remotely install malicious software on a retailer's card-processing systems. This type of point-of-sale malware is capable of copying data stored on a credit or debit card's magnetic stripe when those cards are swiped at compromised payment terminals. This data can then be used to create counterfeit copies of the cards.

[***]

Hy-Vee said the company's investigation is continuing.

"We are aware of reports from payment processors and the card networks of payment data being offered for sale and are working with the payment card networks so that they can identify the cards and work with issuing banks to initiate heightened monitoring on accounts," Hy-Vee spokesperson Tina Pothoff said.

The card account records sold by Joker's Stash, known as "dumps," apparently stolen from Hy-Vee are being sold for prices ranging from $17 to $35 apiece. Buyers typically receive a text file that includes all of their dumps. Those individual dumps records — when encoded onto a new magnetic stripe on virtually anything the size of a credit card — can be used to purchase stolen merchandise in big box stores.

16.     The $17-$35 per account pricetag is consistent with the black-market value of stolen credit card records.  *See, e.g.,*  https://keepersecurity.com/how-much-is-my-information-worth-to-hacker-dark-web.html (finding stolen credit card information to be "roughly $8-$22, or the bitcoin equivalent thereof," with prices tending to be higher for stolen European, Canadian, and Australian credit cards).

17.     On or about October 3, 2019, Hy-Vee issued another press release, entitled *Hy-Vee Reports Findings from Investigation of Payment Card Data Incident*, which confirmed that the malware used to access payment card data at Hy-Vee's fuel pumps, drive-thru coffee shops, and restaurants "searched for track data (which sometimes has the cardholder name in addition to card number, expiration date, and internal verification code) read from a payment card as it was being routed through the POS device."

18.    The October 3, 2019 press release explained that the specific timeframes varied by location, but that the general timeframe was: (i) December 14, 2018 through July 29, 2019 for fuel pumps, and (ii) January 15, 2019 through July 29, 2019 for restaurants and drive-thru coffee shops.

19.    The press release also referred consumers to Hy-Vee's "Payment Card Incident" webpage (https://www.hy-vee.com/paymentcardincident/), which provided a "Location Look Up Tool" for consumers to use to determine whether the Hy-Vee locations where they made purchases were subject to malware and, if so, the timeframe during which purchases were subject to malware for that specific location.

20.    Hy-Vee's "Location Look Up Tool" reports that payment card purchases at the 2920 Fitchrona Road Hy Vee Market Grille location were affected by the breach between January 15, 2019 and July 3, 2019.

21.    Hy-Vee's "Location Look Up Tool" reports that payment card purchases at the 3801 East Washington Avenue Hy Vee Market Grille location were affected by the breach between January 15, 2019 and June 30, 2019.

22.    Hy-Vee's "Location Look Up Tool" reports that payment card purchases at the 675 South Whitney Way Hy Vee Market Grille location were affected by the breach between January 15, 2019 and July 17, 2019.

***Hy-Vee Failed to Adopt Reasonable Procedures to Safeguard Consumers' Payment Card Data***

23.    According to Hy-Vee's August 14, 2019 press release, when a payment card is processed through a checkout line at a Hy-Vee grocery store, Hy-Vee uses "point-to-point encryption technology," which "protects card data by making it unreadable."

24.    Apparently, Hy-Vee does not use "point-to-point encryption technology" to protect data when purchases are made at Hy-Vee fuel pumps, drive-thru coffee shops, or restaurants.

25.     As a result of Hy-Vee's failure to adopt protocols that include point-to-point encryption at Hy-Vee's fuel pumps, drive-thru coffee shops, and restaurants, more than five million consumers' data became available for purchase on the "dark web," where it was sold under the code name "Solar Energy" at the "Joker's Stash" website.  *See, e.g., United States v. Hill*, 769 Fed. Appx. 352, 353 (6th Cir. 2019) (explaining that Joker's Stash is "a website on the dark web from which customers can purchase stolen credit and debit card accounts.").

26.     The risk of data breaches like the one that affected payment card purchases at Hy-Vee's fuel pumps, drive-thru coffee, and restaurants is well-known.  Indeed, upon information and belief, Hy-Vee adopted point-to-point encryption security measures for payment card purchases at its checkout lines in its grocery stores with the express purpose of avoiding such data breaches.

27.     Upon information and belief, as a result of the Data Breach, Plaintiff's and the other Class members' payment card data are now in the hands of unknown persons who intend to use those data for criminal or nefarious purposes.  The payment card data was reportedly made available for purchase on the Joker's Stash website, and can be used to commit identity theft and identity fraud, and commit other acts injurious and detrimental to Plaintiff and the other Class members.

28.     Upon information and belief, Hy-Vee became aware that payment card data had been compromised sometime in late June 2019, around the time the malware stopped affecting payment card purchases at many Hy-Vee locations.

29.     Although Hy-Vee was aware that payment card data had been compromised as early as late-June 2019, it did not inform its consumers about the breach until mid-August.  Upon information and belief, prompt notification would have made it possible for many consumers to avoid a great deal of time and expense associated with having their data compromised by freezing

7

their accounts with the three major credit bureaus and placing immediate freezes on their credit and debit card accounts and requesting new card numbers.

30.     Further, rather than offering to provide credit monitoring services for consumers who were affected when it announced the Payment Card Incident on August 14, 2019, Hy-Vee instead advised consumers to "closely monitor your payment card statements for any unauthorized activity" and "immediately notify the financial institution that issued the card because cardholders are not generally responsible for unauthorized charges reported in a timely manner."

### *Data Breaches Lead to Identity Theft*

31.     According to the U.S. Department of Justice Bureau of Justice Statistics, an estimated 26 million people were victims of one or more incidents of identity theft in 2016.[1]

32.     Consumers' personal information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[2]   As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen private information directly on various Internet websites, making the information publicly available.

33.     According to the U.S. Department of Justice Bureau of Justice Statistics, an estimated 26 million people were victims of one or more incidents of identity theft in 2016.[3]

---

[1]   *See Victims of Identity Theft, 2016,* DOJ, at 1 (2019), available at https://www.bjs.gov/content/pub/pdf/vit16.pdf (last visited Oct. 24, 2019).

[2]   Companies, in fact, also recognize consumers' personal information as an extremely valuable commodity akin to a form of personal property. *See* John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PERSONAL INFORMATION") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009).

[3] See *Victims of Identity Theft, 2016*, DOJ, at 1 (2019), available at https://www.bjs.gov/content/pub/pdf/vit16.pdf (last visited Nov. 15, 2019).

### *The Monetary Value of Privacy Protections and Personal Information*

34.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described

the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[4]

35.     Commissioner Swindle's 2001 remarks are even more relevant today, as

consumers' personal data functions as a "new form of currency" that supports a $26 billion per

year online advertising industry in the United States.[5]

36.     The FTC has also recognized that consumer data is a new (and valuable) form of

currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones

Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[6]

37.     The FTC has brought enforcement actions against businesses for failing to

adequately and reasonably protect customer data, treating the failure to employ reasonable and

appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[4]  Federal Trade Commission Public Workshop, *The Information Marketplace: Merging and Exchanging Consumer Data*, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited November 11, 2019).

[5]  *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited November 11, 2019).

[6]  *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009),   http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited November 11, 2019).

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

38.    Recognizing the high value that consumers place on their personal information, many companies now offer consumers an opportunity to sell this information.  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their personal information.[7]  This business has created a new market for the sale and purchase of this valuable data.[8]

39.    Consumers place a high value not only on their personal information, but also on the privacy of that data.  Researchers have already begun to shed light on how much consumers value their data privacy, and the amount is considerable.  Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2016 was $850." [9]

### *Damages Sustained by Plaintiff and the Other Class Members*

40.    Plaintiff and other members of the Class have suffered injury and damages, including, but not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their personal and financial information, which is now in the hands of criminals; (iii) the value of their time spent mitigating the increased risk of identity theft and

---

[7] Steve Lohr, *You Want My Personal Data? Reward Me for It, The New York Times*,   http://www.nytimes.com/ 2010/07/18/business/18unboxed.html (last visited November 11, 2019).

[8] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160 764037920274.html (last visited November 11, 2019).

[9] See *Victims of Identity Theft, 2016*, DOJ, at 8 (2019), available at https://www.bjs.gov/content/pub/pdf/vit16.pdf (last visited Nov. 15, 2019).

identity fraud; and (iv) the value of their time and expenses associated with mitigation, remediation, and sorting out the risk of fraud and actual instances of fraud.

41.     Plaintiff and the other Class members have suffered and will continue to suffer additional damages based on the opportunity cost and value of time that Plaintiff and the other Class members have been forced to expend and must expend in the future to monitor their financial accounts and credit files as a result of the Data Breach.

## COUNT I – NEGLIGENCE

42.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

43.     Hy-Vee owed to Plaintiff and the other Class members a duty to exercise reasonable care in handling and using the payment card data in its custody, including:

     a.  to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting payment card data in its possession;

     b.  to protect payment card data in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices and the practices and certifications represented on its website which it voluntarily undertook duties to implement; and

     c.  to implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly and sufficiently notifying Plaintiff and the other members of the Class of the Data Breach.

44.     Hy-Vee knew or should have known the risks of collecting and storing payment card data and the importance of maintaining secure systems.  Indeed, Hy-Vee expressly adopted

security protocols to protect consumers' payment card data, including point-to-point encryption measures for payment card purchases through checkout lines in its grocery stores.

45.     Given the nature of Hy-Vee's business, the sensitivity and value of the information it maintains, and the resources at its disposal, Hy-Vee should have identified the vulnerabilities for payment card purchases at Hy-Vee's fuel pumps, drive-thru coffee, and restaurants and prevented the Data Breach from occurring.

46.     Defendant owed these duties to Plaintiff and the other Class members because Plaintiff and the other Class members are a well-defined, foreseeable, and probable class of individuals whom Defendant should have been aware could be injured by Defendant's inadequate security protocols.  Defendant actively profited from using Plaintiff and the other Class members' payment card information to process payments.

47.     Additionally, under Wis. Stat. § 134.98, Defendant owed to Plaintiff and the other Class members a duty to notify them within a reasonable timeframe of any breach to the security of their personal information.

48.     Hy-Vee breached the duties it owed to Plaintiff and Class members in several ways, including:

    a.  by failing to implement adequate security systems, protocols and practices sufficient to protect payment card data and thereby creating a foreseeable, unreasonable risk of harm;

    b.  by failing to comply with the minimum industry data security standards and its own assurances of superior data security standards;

    c.  by negligently performing voluntary undertakings to secure and protect the payment card data it solicited and maintained; and

d.  by failing to timely and sufficiently discover and disclose to consumers that their payment card data had been improperly acquired or accessed, and providing misleading and unfounded suggestions that their information (and by extension their identity) is not in the immediate peril it is in fact in.

e.  But for Hy-Vee's wrongful and negligent breach of the duties it owed to Plaintiff and the other Class members, their Personal Information would not have been compromised.

49.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Hy-Vee's negligent conduct.  Plaintiff and the other Class members have suffered actual damages including improper disclosure of their payment card data, as well as lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that resulted and continues to face them.

50.    Plaintiff's and the other Class members' injuries were proximately caused by Hy-Vee's violations of the common law duties enumerated above, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is warranted.

## COUNT II – BREACH OF IMPLIED CONTRACT

51.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

52.    In using credit or debit cards at Hy-Vee stores, Plaintiff and the other members of the Class entered into an implied contract with Hy-Vee, whereby Hy-Vee became obligated to reasonably safeguard Plaintiff's and the other Class members' payment card data.

53.     Under the implied contract, Hy-Vee was obligated to not only safeguard payment card data, but also to provide Plaintiff and the other Class members with prompt, truthful, and adequate notice of any security breach or unauthorized access of said information.

54.     Hy-Vee breached the implied contract with Plaintiff and the other members of the Class by failing to take reasonable measures to safeguard Plaintiff's payment card data.

55.     Hy-Vee also breached its implied contract with Plaintiff and the other Class members by failing to provide prompt, truthful, and adequate notice of the Data Breach and unauthorized access of their payment card data by hackers.

56.     Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) improper disclosure of their payment card data; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and identity fraud pressed upon them by the Data Breach; (iii) the value of their time spent mitigating the increased risk of identity theft and/or identity fraud; (iv) the increased risk of identity theft; and (v) deprivation of the value of their payment card data, which is likely to be sold to cyber criminals on the dark web.

## COUNT III – UNJUST ENRICHMENT

57.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

58.     Plaintiff and the other Class members conferred a monetary benefit on Hy-Vee. Specifically, Plaintiffs and the other Class members paid for goods sold by Hy-Vee and provided Hy-Vee with payment information. In exchange, Plaintiffs and the other Class members were entitled to have Hy-Vee protect their payment card data with adequate data security.

59.     Hy-Vee knew that Plaintiff and the other Class members conferred a benefit on Hy-Vee. Hy-Vee profited from Plaintiff's and the other Class members' purchases and used their payment card data for business purposes.

60.     Hy-Vee failed to secure Plaintiff's and the other Class members' payment card data and therefore did not provide full compensation for the benefit the Plaintiff and the other Class members provided. Hy-Vee inequitably acquired the payment card data because it failed to disclose its inadequate security practices.

61.     If Plaintiff and the other Class members knew that Hy-Vee would not secure their payment card data using adequate security, they would not have shopped at Hy-Vee's fuel pumps, drive-thru coffee shops, and restaurants.

62.     Plaintiff and the other Class members have no adequate remedy at law.

63.     Under the circumstances, it would be unjust for Hy-Vee to be permitted to retain any of the benefits that Plaintiff and the other Class members conferred on it.

64.     Hy-Vee should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the other Class members proceeds that it unjustly received from them. In the alternative, Hy-Vee should be compelled to refund the amounts that Plaintiff and the other Class members overpaid.

## COUNT IV – NEGLIGENCE *PER SE*

65.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

66.     Section 5 of the FTCA prohibits "unfair … practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Hy-Vee, of failing to use reasonable measures to protect payment card data.

67.     Hy-Vee violated Section 5 of the FTCA by failing to use reasonable measures to protect payment card data and not complying with applicable industry standards, as described herein. Hy-Vee' conduct was particularly unreasonable given the nature and amount of payment card data it obtained and stored, and the foreseeable consequences of a data breach at a retail chain as large as Hy-Vee, including, specifically, the damages that would result to Plaintiff and Class members.

68.     Hy-Vee' violation of Section 5 of the FTCA constitutes negligence *per se*.

69.     Plaintiff and Class members are within the class of persons that the FTCA was intended to protect.

70.     The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

71.     As a direct and proximate result of Hy-Vee' negligence *per se*, Plaintiff and the Class will suffer injuries, including: inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach; false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and forgone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take

months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

## COUNT V – DECLARATORY JUDGMENT

72.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

73.    Plaintiff and members of the Class entered into an implied contract that required Defendant to provide adequate security for the personal information it collected from Plaintiffs' and Class members' payment card transactions.

74.    Defendant owes duties of care to Plaintiff and the members of the Class which would require it to adequately secure personal information.

75.    Defendant still possesses payment card data regarding Plaintiffs and the Class members.

76.    Although since the Data Breach, Hy-Vee has announced it is monitoring its data security systems to fix the vulnerabilities in its systems which permitted the intrusions and to prevent further attacks, there is no detail on what, if any, fixes have occurred.

77.    Accordingly, Hy-Vee still has not satisfied its contractual obligations and legal duties to Plaintiffs. In fact, now that Hy-Vee' lax approach towards information security, possibly as a result of cost-cutting, has become public, the personal information in Defendant's possession is more vulnerable than previously.

78.    Actual harm has arisen in the wake of the Data Breach regarding its contractual obligations and duties of care to provide security measures to Plaintiff and the members of the Class.  Further, Plaintiff and the members of the Class are at risk of additional or further harm due

to the exposure of their personal information and Defendant's failure to address the security failings that lead to such exposure.

79.    There is no reason to believe that Defendant's security measures are any more adequate than they were before the breach to meet Defendant's contractual obligations and legal duties, and there is no reason to think Defendant has no other security vulnerabilities that have not yet been knowingly exploited.

80.    Plaintiff, therefore, seek a declaration that  (1) Hy-Vee' existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) to comply with its contractual obligations and duties of care, Hy-Vee must implement and maintain reasonable security measures, including, but not limited to:

      a.    ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Hy-Vee' systems on a periodic basis, and ordering Hy-Vee to promptly correct any problems or issues detected by such third-party security auditors;

      b.    ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

      c.    ordering that Hy-Vee audit, test, and train its security personnel regarding any new or modified procedures;

      d.    ordering that Hy-Vee segment customer data by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   ordering that Hy-Vee purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f.   ordering that Hy-Vee conduct regular database scanning and security checks;

g.   ordering that Hy-Vee routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.   ordering Hy-Vee to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Hy-Vee customers must take to protect themselves.

## **CLASS ALLEGATIONS**

81.    Plaintiff brings this action on behalf of a Class, consisting of:

All persons residing in the United States of America who made payment card purchases at affected locations during the affected time periods. Excluded from the foregoing class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

82.    Plaintiff also brings this action on behalf of a Subclass, consisting of all members of the Class residing in the State of Wisconsin.

83.    The Class is so numerous that joinder is impracticable.  Upon information and belief, there are more than five million members of the Class and tens or hundreds of thousands of members of the Subclass.

84.    There are questions of law and fact common to the members of the Class, which common questions predominate over any questions that affect only individual class members.  The predominant common questions include:

a. Whether Hy-Vee had a duty to protect Plaintiff and Class members' payment card data;

b. Whether Hy-Vee knew or should have known of the susceptibility of their data security systems to a data breach;

c. Whether Hy-Vee's security measures to protect their systems were reasonable in light of the measures recommended by data security experts;

d. Whether Hy-Vee was negligent in failing to implement reasonable and adequate security procedures and practices;

e. Whether Hy-Vee's failure to implement adequate data security measures allowed the breach to occur;

f. Whether Hy-Vee's conduct, including their failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the disclosure of Plaintiff and Class members' payment card data;

g. Whether Plaintiff and Class members are entitled to relief.

85.    Plaintiff's claims are typical of the claims of the Class members.  All are based on the same factual and legal theories.

86.    Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel experienced in consumer class action cases including data breach litigation.

87.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

**<u>JURY DEMAND</u>**

88.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and

the Class and against Defendant for:

(a)     actual damages;

(b)     statutory damages;

(c)     punitive damages;

(d)     restitution;

(e)     injunctive relief;

(f)     attorneys' fees, litigation expenses and costs of suit; and

(g)     such other or further relief as the Court deems proper.

Dated:  November 15, 2019

Respectfully submitted,

/s/ John D. Blythin

**ADEMI & O'REILLY, LLP**
Shpetim Ademi (SBN 1026973)
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
Jesse Fruchter (SBN 1097673)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
sademi@ademilaw.com
jblythin@ademilaw.com
meldridge@ademilaw.com
jfruchter@ademilaw.com

**BARNOW AND ASSOCIATES, P.C.**
Ben Barnow
Erich P. Schork (to be admitted)
One North LaSalle Street, Suite 4600

Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312)-641-5504
b.barnow@barnowlaw.com
e.schork@barnowlaw.com